[L.A. No. 31922. Sept. 26, 1985.]

LINA GUTIERREZ, Plaintiff and Appellant, v.
MASSOUD MOFID et al., Defendants and Respondents.

## COUNSEL

James M. Radnich for Plaintiff and Appellant.

Leonard Sacks, Jean Corey, Al Schallau, Robert E. Cartwright, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, David S. Casey, Jr., Victoria De Goff, Douglas K. deVries, H. Grieg Fowler, Sanford M. Gage, Ian Herzog, G. Dana Hobart, Stanley K. Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Robert H. Sulnick, Arne Werchick and Stephen I. Zetterberg as Amici Curiae on behalf of Plaintiff and Appellant.

Morgan, Wenzel & McNicholas, Walter M. Yoka, Hill, Genson, Even, Crandall & Wade, Randolph M. Even, William R. Lowe and William F. Zulch for Defendants and Respondents.

Greines, Martin, Stein & Richland, Alan G. Martin, Martin Stein and Timothy T. Coates as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**GRODIN, J.**—A medical malpractice action must be commenced within one year after the patient "discovers, or through the use of reasonable diligence should have discovered" his "injury." (Code Civ. Proc., § 340.5.)[1] Is the time of "discovery" postponed when a suspicious patient consults an attorney who advises that there is no legal remedy? We conclude that it is not. We will therefore affirm the summary judgment in favor of these malpractice defendants.

### FACTS

Plaintiff entered defendant White Memorial Medical Center (the hospital) in December 1978 with a pain in her right side. On December 22, surgery was performed for the condition. Plaintiff alleges she gave consent only to an exploratory operation to remove a tumor or her appendix. When she awoke, however, she learned to her horror that the doctors (defendants Mofid and Tsai) had done a complete hysterectomy.

In her deposition, plaintiff declared that she communicated her distress to many members of the staff throughout her stay at the hospital. She felt consistently that the doctors had done something wrong to her by failing to warn her in advance that the operation might end her ability to conceive. When Dr. Matsumura, a hospital physician, told her "they had done that [removed her reproductive organs] because if the other tumor came out, I would have a 50 percent possibility of dying," she responded that "I would have waited up to 99 percent, I would have taken that risk."

Plaintiff continued to be upset after her release on December 27, 1978. In January 1979, a Dr. Charavastra told her she could sue and recommended

---

[1]Section 340.5 provides in pertinent part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person. . . ."

All statutory references are to the Code of Civil Procedure unless otherwise indicated.

she do so as a release from her "angerness." In February 1979, another physician, Dr. Perez, told her that the surgery had been "too much," and she "knew" this was so. A psychiatrist, Dr. Beton, said the doctors should have asked her first if she wanted them to perform a hysterectomy.

In April 1979, plaintiff consulted a firm of malpractice attorneys. The lawyer who interviewed her told her there was "no provable malpractice."

Nonetheless, friends persisted in urging her to sue so she could obtain money to adopt a child. In June or July 1979, plaintiff went to Mexico to visit her family; they reinforced this advice. Plaintiff still had it in her mind to file an action for "revenge" against the doctors and "so they wouldn't do the same to another person." In November 1980, plaintiff consulted a second firm of lawyers, and this suit was filed on November 21 of that year.

## DISCUSSION

Section 340.5 provides that the time for commencement of an action for injury or death based on alleged professional negligence by a health care provider "shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever [time period expires] first." The three-year period is tolled "(1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person." The statute makes clear, however, that the one-year period is not similarly extended. ■ Thus, regardless of extenuating circumstances, the patient must bring his suit within one year after he discovers, or should have discovered, his "injury." (*Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 100-101 [132 Cal.Rptr. 657, 553 P.2d 1129].)

In *Sanchez, supra,* we indicated that by common law tradition, the term "injury," as used in section 340.5, means both "a person's physical condition *and* its 'negligent cause.'" (P. 99, citing *Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 776-777 [270 P.2d 1]; *Mock* v. *Santa Monica Hospital* (1960) 187 Cal.App.2d 57, 64 [9 Cal.Rptr. 555]; see also *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 433-435 [186 Cal.Rptr. 228, 651 P.2d 815]; italics in original.) Thus, once a patient knows, or by reasonable diligence should have known, that he has been harmed through professional negligence, he has one year to bring his suit.

The patient is charged with "presumptive" knowledge of his negligent injury, and the statute commences to run, once he has " 'notice or information of circumstances to put a reasonable person *on inquiry, or has the*

*opportunity to obtain knowledge* from sources open to his investigation . . . .' " (*Sanchez, supra,* at p. 101, quoting 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, p. 1181 [citing numerous cases]; italics added by *Sanchez.*) Thus, when the patient's "reasonably founded suspicions [have been aroused]," and she has actually "become alerted to the necessity for investigation and pursuit of her remedies," the one-year period for suit begins. (18 Cal.3d at p. 102.)

■ The evidence on summary judgment makes clear, and plaintiff concedes for purposes of argument, that she both knew of her injury and suspected malpractice almost immediately after the operation. In her deposition, she indicated that the doctors had described a simple operation for appendicitis or a tumor; the hysterectomy from which she awoke far exceeded her understanding or consent. She was not satisfied with the explanation offered by Dr. Matsumura. When she left the hospital in late December 1978, she felt the surgeons had "done something wrong" to her. In January 1979, another physician, Dr. Charavastra, advised her to sue, and in February Dr. Perez told her she had been given "too much" surgery. Her devastation at the loss of her ability to conceive fueled her incentive to investigate. She consulted an attorney precisely because she wished to explore her legal remedies. Under *Sanchez,* plaintiff was clearly on "presumptive" notice of her claim at the time she saw the lawyer, and the one-year period had therefore started. (18 Cal.3d at pp. 101-103.)

Plaintiff argues, however, that her prompt consultation with an attorney prevented her from learning the "negligent cause" of her condition—a necessary element of discovery of her "injury"—since the lawyer told her she had no legal claim. Because she was entitled to rely on the lawyer's advice, she urges, she had satisfied the duty of diligent inquiry imposed by her initial suspicions and had lost "the opportunity to obtain knowledge from sources open to [her] investigation." (*Id.,* at p. 101.) Plaintiff suggests that the one-year limitations period began to run only when she was advised by a second lawyer that she had a basis for suit after all. Her assertions are supported by one Court of Appeal decision, *Jones* v. *Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700, 703 [153 Cal.Rptr. 662].

■ However, the uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim. (E.g., *Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177] [fraud or mistake in contract; applying §§ 337, subd. 3, 338, subd. 4]; *Sanchez, supra,* 18 Cal.3d at p. 99 [medical malpractice; physical condition and negligent *cause*]; *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161] [stating

general rule]; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190 [98 Cal.Rptr. 837, 491 P.2d 421] [legal malpractice; "all material facts essential to show the elements of that cause of action"; see now § 340.6]; *Huysman* v. *Kirsch* (1936) 6 Cal.2d 302, 312 [57 P.2d 908] [medical malpractice; ignorance of negligent cause of injury].) It is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action. Thus, if one has suffered appreciable harm and knows or suspects that professional blundering is its cause, the fact that an attorney has not yet advised him does not postpone commencement of the limitations period. (*Graham* v. *Hansen* (1982) 128 Cal.App.3d 965, 972, 974 [180 Cal.Rptr. 604]; *McGee* v. *Weinberg* (1979) 97 Cal.App.3d 798, 802-803 [159 Cal.Rptr. 86]; *Gray* v. *Reeves* (1977) 76 Cal.App.3d 567, 576-577 [142 Cal.Rptr. 716]; *DeVault* v. *Logan* (1963) 223 Cal.App.2d 802, 809 [36 Cal.Rptr. 145].)

Aside from *Jones, supra,* there is little authority on the issue whether *discouraging* advice from an attorney can affect the limitations period. It might be argued, as plaintiff implies, that refusal to take such advice into account contravenes the proper purposes of the "constructive notice" rule. That rule is premised on the notion that "the means of knowledge are the equivalent of knowledge." It declines to reward the plaintiff for his ignorance in fact if he had "the opportunity to obtain knowledge from sources open to his investigation" and should, by the exercise of "reasonable diligence," have obtained it. (§ 340.5; *Sanchez, supra,* 18 Cal.3d at p. 101; *Gray, supra,* 76 Cal.App.3d at p. 576; see *Baker* v. *Beach Aircraft Corp.* (1974) 39 Cal.App.3d 315, 321 [114 Cal.Rptr. 171].) If plaintiff pursues the "sources open to his investigation" with "reasonable diligence" but receives inaccurate professional advice about his rights, he may be blamelessly ignorant of information vital to their exercise. He should not be penalized, one might reason, for his decision not to file a claim he reasonably believes to be false.

■ Nonetheless, we are not persuaded that reliance on an attorney's advice postpones the time of "discovery," thus extending the limitations period applicable to one who had already come to suspect he is a victim of malpractice. ■ "'Statutes of limitation . . . are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" (*Wood* v. *Elling Corp.* (1977) 20 Cal.3d 353, 362 [142 Cal.Rptr. 696, 572 P.2d 755], quoting *Telegraphers* v. *Ry. Express Agency* (1944) 321 U.S. 342, 348 [88 L.Ed. 788, 792,

64 S.Ct. 582]; see also *American Pipe & Construction Co.* v. *Utah* (1974) 414 U.S. 538, 554 [38 L.Ed.2d 713, 727, 94 S.Ct. 756], rehg. den., 415 U.S. 952 [39 L.Ed.2d 568, 94 S.Ct. 1477]; *Davies, supra,* 14 Cal.3d at p. 512.) Limitations statutes afford repose by giving security and stability to human affairs. (*Valley Circle Estates* v. *VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 615 [189 Cal.Rptr. 871, 659 P.2d 1160]; *Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 787 [157 Cal.Rptr. 392, 598 P.2d 45].)

"In ordinary tort and contract actions, the statute of limitations . . . begins to run upon the occurrence of the last element essential to the cause of action. [Even] [t]he plaintiff's ignorance of the cause of action, or of the identity of the wrongdoer, does not toll the statute. [Fn. omitted.] . . ." (*Neel, supra,* 6 Cal.3d at p. 187.) In certain instances, however, that general rule has been broached because of the need to balance "the practical purpose that a statute of limitations serves in our legal system" against the "practical needs of prospective plaintiffs." (*Davies, supra,* 14 Cal.3d at p. 512.)

The "discovery" exception applicable to malpractice is premised upon special considerations surrounding that tort which diminish the force of the *defendant's* argument that he is entitled to the early protection of the statutory bar. In many cases, the harm caused by medical malpractice is not immediately apparent. The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects. Thus, even if a patient is unhappy with his condition, he may not suspect he has been wronged. Lacking medical knowledge, he may reasonably rely upon his negligent physician's soothing disclaimers. (See, e.g., *Brown, supra,* 32 Cal.3d at p. 434.) For these and other reasons, one often has no prompt means of learning that he has been hurt by professional negligence.

On the other hand, the professional's fiduciary and confidential relationship with his client or patient both compels the professional to disclose, rather than conceal, his error and mitigates the injured person's duty to discover it independently. A delayed limitations period encourages the professional tortfeasor to fulfill his "fiduciary duty of full disclosure; it prevents the fiduciary from obtaining immunity for an initial breach of duty [i.e., the malpractice] by a subsequent breach of the obligation of disclosure." (*Neel, supra,* 6 Cal.3d at p. 189; see also *Sanchez, supra,* 18 Cal.3d at p. 97.) None of these concerns is met by extending a defendant's exposure when, despite plaintiff's discovery of the facts constituting his claim, and without defendant's fault, plaintiff is dissuaded from suit by the conduct of a third person.

■ We conclude that, for purposes of the statute of limitations, the risk that discouraging legal advice will lead to loss of a cause of action must fall upon the plaintiff who obtains that advice, rather than upon a wholly uninvolved defendant. In that situation, "the right to be free of stale claims . . . comes to prevail over the right to prosecute them." (*Wood, supra,* 20 Cal.3d at p. 362.)

In fact, the law has always so assumed. Insofar as "constructive notice" and "diligent investigation" affect the computation of the limitations period, the plaintiff is generally charged with the lapses of attorneys acting in his behalf. (E.g., *Miller, supra,* 33 Cal.3d at p. 875.) Plaintiff's remedy is a suit for legal malpractice against his counsel.

■ It is well settled that an attorney is liable for malpractice when his negligent investigation, advice, or conduct of the client's affairs results in loss of the client's meritorious claim. (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 358-361 [118 Cal.Rptr. 621, 530 P.2d 589].) A legal malpractice suit is the traditional means of resolving allegations that an attorney's misconduct caused a claim to become barred by the statute of limitations. (See, e.g., *Bland* v. *Reed* (1968) 261 Cal.App.2d 445, 449 [67 Cal.Rptr. 859]; *Shelley* v. *Hanson* (1966) 244 Cal.App.2d 210, 213-214 [53 Cal.Rptr. 20].) By this means, the attorney who caused the delay, rather than the "innocent" defendant, is charged with its consequences.[2]

Plaintiff urges that under *Ebersol* v. *Cowan* (1983) 35 Cal.3d 427 [197 Cal.Rptr. 601, 673 P.2d 271], diligent but unsuccessful inquiries to lawyers can delay expiration of a limitations period. In *Ebersol,* we concluded that a trial court abused its discretion by declining relief, sought on grounds of "excusable neglect," from the 100-day claim-filing requirement for suit against a government entity. (Gov. Code, §§ 911.2, 911.6, 945.4, 946.6.) We find *Ebersol* inapposite here.

---

[2]The Chief Justice urges in dissent that discouraging advice from an attorney should toll a "discovery" statute of limitations, since such advice nullifies the client's previous suspicions. On the other hand, the Chief Justice proposes that those "absolute" limitations periods not dependent on discovery would not be affected by an attorney's bad advice. Any such distinction seems illogical and unfair. The *facts* of some claims may be harder to discover than the facts of others; thus, the Legislature has wisely provided for discovery time in some of the more difficult cases. But all lay plaintiffs are equally dependent on attorneys to evaluate the legal merits of their claims. No plaintiff can be expected to file a suit a lawyer has told him is invalid. Yet, as the Chief Justice concedes, tolling "absolute" limitations periods in cases of discouraging legal advice would allow open-ended liability, a result the Legislature has plainly sought to avoid.

Until now, as we note, the law has resolved these concerns by barring the stale claim against the original tortfeasor but allowing the plaintiff to sue the attorney whose bad advice caused the delay. The wisdom of that policy applies to both "discovery" and "absolute" statutes of limitations, and we adhere to it.

Plaintiff Ebersol drove a bus for a company which had contracted to provide transportation to a work training program for developmentally disabled youths. After three weeks on this route, she was bitten by one of her regular passengers when she attempted to calm him. In subsequent weeks, eight attorneys refused her case; the first contacted said she had no claim and the remaining seven gave no advice at all.

After the 100-day period had run, plaintiff consulted a ninth law firm. A paralegal and an attorney in the firm both suggested she had at most a worker's compensation claim. Later that day, however, another of the firm's lawyers determined that the agency sponsoring the training program could be liable in tort if it knew but failed to warn plaintiff that the boy might be dangerous. (Cf. *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334].) Subsequent investigation revealed that Ventura County sponsored the program. The county rejected a claim presented on the 127th day after the injury (Gov. Code, § 911.6, subd. (a)), and the superior court denied relief.

We affirmed in *Ebersol* that "excusable neglect" which justifies relief from the claim statute (*id.*, § 946.6, subd. (c)(1)) is "neglect that might have been the act or omission of a reasonably prudent person under the same or similar circumstances. [Citation omitted.]" (35 Cal.3d at p. 435.) We noted that claim-statute relief has traditionally been warranted where the injured party made diligent efforts to secure counsel within the 100-day period. We rejected the contention that Ebersol had acted inexcusably when she concentrated on finding an attorney instead of investigating on her own the facts necessary to her claim. We suggested that she had no duty, unassisted by counsel, to learn the county's identity or the subtle legal theories which might make the county liable for her injury. (*Id.*, at pp. 436-439.)

However, the claim-statute relief provisions addressed in *Ebersol* are fundamentally distinct from the statute of limitations at issue here. The 100-day government claim requirement is an obstacle *in addition to the normal limitations period* applicable to the tort alleged. Because the claim period is so short, and because lay persons may have no idea of its existence, it looms as a trap for the unwary. Realizing this, the Legislature has devised a remedial scheme for relief from this harsh and technical deadline where justice requires. (*Id.*, at p. 435; see *Viles* v. *State of California* (1967) 66 Cal.2d 24, 30-31 [56 Cal.Rptr. 666, 423 P.2d 818].) By the statute's terms, relief is justified in this special case for *any* "neglect" of the plaintiff (or his counsel) which is "excusable." With traditional exceptions, that language invites inquiry into *all aspects of plaintiff's diligence in presenting his claim,* and the courts have so concluded.

By contrast, the one-year limitations period for medical malpractice—no shorter than the period applicable to personal injury suits in general—begins to run upon discovery, actual or constructive, of an "injury," that is, an abnormal condition and its negligent cause. The period expires inexorably one year later, and the Legislature has made no provision for relief on general grounds of "excusable neglect" to file suit on time. In other words, in medical malpractice cases we must examine whether plaintiff exercised "reasonable diligence" in discovering his "injury," but the malpractice limitations statute forecloses a more general inquiry whether he was nonetheless diligent in bringing his action.[3]

█ We conclude that the one-year "discovery" limitations period for medical malpractice (§ 340.5) is not delayed, suspended, or tolled when a plaintiff with actual or constructive knowledge of the facts underlying his malpractice claim is told by an attorney that he has no legal remedy.[4] To the extent that *Jones* v. *Queen of the Valley Hospital, supra,* 90 Cal.App.3d 700, is inconsistent with this view, that decision is disapproved.[5]

Here, the one-year limitations period had begun to run no later than April 1979, when plaintiff, aware of her unexpected hysterectomy and suspicious of malpractice, had been advised by a physician to sue for her injuries and decided to consult an attorney for that purpose.[6] The limitations period was

---

[3]Even the government claim statute provides that a claim is *absolutely barred* if not presented to the agency within *one year* after "accrual of the cause of action." (Gov. Code, §§ 911.4, subd. (b); 946.6, subd. (c).)

[4]Authorities from other jurisdictions, though sparse, support our conclusion. In *Conway* v. *Huff* (Ky. 1982) 644 S.W.2d 333, the Kentucky Supreme Court confirmed that the malpractice limitations period begins upon discovery of the wrong, not of the right to sue. (P. 334.) One appellate court has held directly that "no merit" advice from an attorney will not stop the statute from running after plaintiff has become aware of the facts underlying his claim. (*Wood* v. *Gibbons* (1984) 38 Wn.App. 343 [685 P.2d 619, 622].)

[5]Justice Reynoso suggests that we should give particular deference to the Court of Appeal's opinion in *Jones, supra,* since the Legislature has taken no action since 1979 to overturn that decision. But the Legislature's mere failure to respond to a judicial construction of its statute is no evidence of its acquiescence in the ruling. (Cf., e.g., *In re Marriage of Skelkley* (1976) 18 Cal.3d 365, 369 [134 Cal.Rptr. 197, 556 P.2d 297] [subsequent *enactment* or *reenactment* of judicially construed language implies approval of judicial interpretation]; *Burt* v. *Scarborough* (1961) 56 Cal.2d 817, 822 [17 Cal.Rptr. 146, 366 P.2d 498] [failure to overrule decision when Legislature subsequently *considers amending* the same statute is evidence of approval]; *People* v. *Hallner* (1954) 43 Cal.2d 715, 718 [277 P.2d 393] [same].)

[6]The instant case, like *Sanchez, supra,* is distinguishable on its facts from *Brown, supra.* In *Brown,* this court concluded that a malpractice plaintiff could not be charged as a matter of law with discovery of professional negligence despite a chorus of ridicule and concern from friends and health professionals over her disfigured and painful feet after a corn operation. Plaintiff's statement in *Brown* that she continued to believe her podiatrist's explanations raised a triable issue on the question of discovery. (32 Cal.3d at p. 436.) Plaintiff here expressed no similar faith in her surgeons' treatment.

not affected when counsel told her there was "no provable malpractice." Hence, the statute of limitations ran no later than April 1980, and plaintiff's suit, filed in November 1980, was untimely. We therefore affirm the summary judgment for defendants.[7]

Mosk, J., Kaus, J., Broussard, J., and Lucas, J., concurred.

**REYNOSO, J.**—I dissent.

Since 1979 Court of Appeal case law has been clear, as a matter of statutory interpretation, that the statute of limitations in medical malpractice cases run after one year only if the plaintiffs knew or reasonably should have known that the cause was actionable. (*Jones* v. *Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700 [153 Cal.Rptr. 662].) The three-year statute is absolute. The Legislature, faced with that interpretation, made no change in the statute. The general rule of statutory construction is that, absent statutory change, the interpretation continues as good law. (See *Slocum* v. *Bear Valley Irrigation Co.* (1898) 122 Cal. 555, 556 [55 P. 403]; *People* v. *Hallner* (1954) 43 Cal.2d 715, 719 [277 P.2d 393]; *Burt* v. *Scarborough* (1961) 56 Cal.2d 817, 822 [17 Cal.Rptr. 146, 366 P.2d 498]; *Fullerton* v. *State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 602 [153 Cal.Rptr. 518].) This is not an unalterable rule, of course. However, when the interpretation is reasonable it should not be supplanted by another reasonable interpretation from this court, absent a factor which tips the balance in favor of the new interpretation. Since the unanimous Court of Appeal opinion authored by Presiding Justice Kingsley properly followed the above rule of construction, I adopt the opinion as my own. It reads:

"Plaintiff has sued for damages based on a claim that defendant doctors, employed by defendant hospital, performed a hysterectomy on her without her knowledge or consent. The trial court granted summary judgment for the defendants on the ground of the statute of limitations. We reverse.

"Plaintiff was a patient in defendant hospital. On December 22, 1978, she was operated on by defendant doctors. Her claim is that she had consented to an operation for the removal of her appendix and a tumor but that, while she was under anesthesia, the doctors had also performed a complete hysterectomy.

---

[7]Insofar as plaintiff's claim arises from an operation beyond the scope of consent, it sounds in battery, which is governed by the one-year-from-injury limitation period of section 340, subdivision (3). (*Brown, supra,* 32 Cal.3d at p. 431, fn. 1.) Hence, the statute of limitations on this cause of action expired in December 1979, one year after the operation and eleven months before suit was filed.

"In April of 1979, she consulted a well-known firm of attorneys, professionally known as experts in the field of medical malpractice litigation, and was advised that she had no cause of action against the doctors or hospital. Plaintiff continued to feel distressed and angry over the extent of the operation and, finally, after much urging by friends, consulted her present counsel who, on November 21, 1980, filed the present action.

"Section 340.5 of the Code of Civil Procedure provides in pertinent part as follows:

" 'In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. . . .'

"In *Jones* v. *Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700, we construed and applied that section in a case somewhat similar to the case at bench. In *Jones,* a child was misdiagnosed by defendant doctors as having only a case of flu, was given medicine and sent home. The child was worse the following morning, was returned to the hospital but died on that trip. It was later discovered that the child was suffering from meningococcemia, for which the simple treatment recommended was inappropriate. As here, parents consulted a firm of attorneys, who, after examining the hospital records, advised them that they had no cause of action. Again as here, the parents were unhappy over the advice, eventually consulted a second attorney, who filed a malpractice suit, but over a year after the misdiagnosis. We held that the statute did not begin to run until the injured person knew both of the medical error and knew, also, that the error was actionable.[1] We can see no difference here.

" [1] The Supreme Court denied hearing in *Jones.* Admittedly plaintiff knew the morning after the operation that a hysterectomy, to which she had not consented, had been performed. But she satisfied the requirement of investigation and was told that the operation, although not consented to, was not actionable. The rule of *Jones* applies here. The action is not barred by section 340.5.

"The judgment is reversed." [End of opinion.]

Since I agree with the conclusion of the Court of Appeal I, too, would reverse.

**BIRD, C. J.**—I respectfully dissent. The majority conclude that plaintiff's medical malpractice action is barred by Code of Civil Procedure section

340.5[1] because it was not filed within a year of April 1979 when plaintiff was "advised by a physician to sue for her injuries and decided to consult an attorney for that purpose." (Maj. opn., *ante,* at p. 902.) However, when plaintiff consulted the attorney she was told that she could not sue because there was no "provable malpractice." In light of the attorney's advice, plaintiff cannot be said to have discovered her injury and its " 'negligent cause' " in April of 1979. (See *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 99 [132 Cal.Rptr. 657, 553 P.2d 1129].) Although the physician's advice may have been "sufficient to place a reasonable person on inquiry as to the probability of actionable conduct on the part of defendants" (*Graham* v. *Hansen* (1982) 128 Cal.App.3d 965, 973 [180 Cal.Rptr. 604]), plaintiff's subsequent discussions with the attorney nullified any "discovery" she may have made and convinced her that she had no cause of action.

Plaintiff used reasonable diligence in an attempt to redress her grievances. (See § 340.5.) Upon receipt of information that raised a suspicion of negligence, she promptly sought legal advice. However, that legal advice hindered this otherwise diligent plaintiff from discovering her cause of action. Since plaintiff was, therefore, "blamelessly ignorant" of her cause of action (see maj. opn., *ante,* at p. 898), I see no reason to penalize her by depriving her of the right to seek compensation for her injuries.

An injured party cannot and should not be expected to file a lawsuit that she has been told is meritless. This court should follow the precedent established in *Jones* v. *Queen of the Valley Hospital* (1979) 90 Cal.App.3d 700, 703 [153 Cal.Rptr. 662]. The one-year "discovery" statute of limitations found in section 340.5 should have been tolled once plaintiff was informed by her attorney that she "would not be able to sue."

The majority concede the logic of this position. (Maj. opn., *ante,* at p. 898.) They also admit that the refusal to take discouraging legal advice into account in determining the limitations period arguably "contravenes the proper purposes of the 'constructive notice' rule." (*Id.,* at p. 898.)

As the majority note, "[t]hat rule is premised on the notion that 'the means of knowledge are the equivalent of knowledge.' It declines to reward the plaintiff for his ignorance in fact if he had 'the opportunity to obtain knowledge from sources open to his investigation' and should, by the exercise of 'reasonable diligence,' have obtained it." (*Ibid.*) Similarly, a diligent plaintiff should not be penalized where the sources open to her investigation do not lead to the discovery of her cause of action but, instead, impede it.

---

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

It is arguable that plaintiff received notice of the negligent cause of her injury when Dr. Perez told her in February of 1979 that the doctors had performed "too much" surgery. However, that notice was effectively negated by the attorney's advice in April of 1979 that plaintiff would not be able to sue. Plaintiff was left without notice of the negligent cause of her injury. Therefore, the one-year "discovery" statute of limitations began to run in February of 1979 but was tolled from April of 1979 until November of 1980 when plaintiff was informed by her second attorney that she had a cause of action for medical malpractice.

Plaintiff was injured in December of 1978. She filed her action in November of 1980, well within the three-year absolute limitations period of section 340.5. Since the discovery limitations period was tolled, plaintiff also satisfied the one-year discovery statute of limitations. Therefore, plaintiff's action was timely filed.

The majority recognize the harshness of their rule. However, they suggest that it is necessary to avoid grafting an implied exception, open-ended in nature, onto the absolute time bars imposed by other statutes. (Majority opn., *ante,* at p. 900, fn. 2.) Plaintiff does not argue for an open-ended exception. She concedes that the three-year absolute statute of limitations in section 340.5 should not be tolled upon an attorney's advice not to sue. Nevertheless, the majority suggest that if discouraging legal advice were held to extend the one-year discovery period of limitations for medical malpractice, fairness would dictate that "those 'absolute' limitations periods not dependent on discovery" (majority opn., *ante,* at p. 900, fn. 2) should be similarly tolled. Since such statutes contain no outside limitations period, the result would be an unlimited extension.

The majority's fear is unfounded. The logic that supports extending a "discovery" period of limitations does not apply to an absolute limitations period fixed without reference to the plaintiff's knowledge. A discovery period of limitations should be tolled after discouraging legal advice because such advice negates the conclusion that the injured party has discovered facts "sufficient to place a reasonable person on inquiry as to the probability of actionable conduct on the part of defendants." (*Graham* v. *Hansen, supra,* 128 Cal.App.3d at p. 973.) However, an absolute statute of limitations, like the three-year provision of section 340.5, runs from the date of injury and is not dependent upon or influenced by the plaintiff's knowledge.

The discovery limitations period was developed by the common law as an exception to the conventional, absolute statute of limitations. (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at pp. 96-97.) It was applied to medical malpractice suits because a layperson "may not recognize the

negligence of the professional when he sees it" and "often he will lack any opportunity to see it." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 188 [98 Cal.Rptr. 837, 491 P.2d 421].) The discovery limitations period is a "modern adjustment," reflecting a "concern for the practical needs of prospective plaintiffs." (*Davies* v. *Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161].)

However, the discovery limitations period was harshly criticized by the medical profession and its insurers because it left physicians under the perpetual threat of a malpractice suit, "regardless of the number of years that [had] elapsed since the patient was treated." (Comment, *A Four Year Statute of Limitations for Medical Malpractice Cases: Will Plaintiff's Case be Barred?* (1971) 2 Pacific L.J. 663, 668, hereafter *Medical Malpractice.*) In 1970 the Legislature responded by enacting section 340.5, which, in its present form, places an absolute limitations period of three years on a medical malpractice action. (See *id.,* at pp. 667-670; § 340.5.) This limitations period applies regardless of the plaintiff's failure to discover his or her injury and its negligent cause.

By placing a cap on the otherwise open-ended discovery period of limitations, the Legislature balanced the injured plaintiff's interest in compensation against the physician's interest in being free of stale claims. (See *ibid.*) In essence, the Legislature determined that after three years, " 'the right to be free of stale claims . . . comes to prevail over the right to prosecute them' " (*Wood* v. *Elling Corp.* (1977) 20 Cal.3d 353, 362 [142 Cal.Rptr. 696, 572 P.2d 755]).

The majority also argue that "[a] delayed limitations period encourages the professional tortfeasor to fulfill his 'fiduciary duty of full disclosure.' " (Majority opn., *ante,* at p. 899.) According to the majority, this purpose is not furthered by extending the discovery limitations period when "plaintiff is dissuaded from suit by the conduct of a third person." (*Ibid.*) This reasoning is unpersuasive. In light of the three-year *absolute* bar of section 340.5, the one-year discovery statute of limitations provides physicians with no incentive to reveal potential negligence to their patients.

It is arguable that prior to enactment of section 340.5, a physician was "encouraged" to tell his patients of possible malpractice. Because the one-year discovery period was not subject to any absolute bar, a physician who made no disclosure faced the possibility of a lawsuit long after the alleged malpractice had occurred, as long as the patient had not discovered the negligence through another source. Therefore, in view of the hardship of defending a stale claim, a physician might have preferred to risk an imme-

diate lawsuit resulting from disclosure, rather than gamble that the patient would never discover the negligent cause of his or her injury.

The situation was altered drastically when section 340.5 was enacted. Section 340.5 eliminated the open-ended feature of the one-year discovery limitations period and imposed an absolute statute of limitations on medical malpractice claims.[2] This absolute limitations period applies regardless of plaintiff's knowledge. Thus, the physician need not disclose his or her negligence in order to avoid the possibility that a suit will be filed many years after the alleged injury. Moreover, the advantage the physician gains by the suit being filed more promptly if disclosure is made, is outweighed by the possibility that, absent disclosure, the injured party may fail to discover his or her injury in time to file suit. Therefore, the one-year discovery limitations period no longer provides the physician with any incentive to disclose his or her negligence.

To the extent that physicians are encouraged by section 340.5 to reveal their negligence, the incentive is provided by the tolling provision included in the statute, not by the one-year discovery limitations period. The tolling provision states that the three-year absolute limitations period will be tolled, inter alia, upon proof of fraud or "intentional concealment."

As originally proposed, section 340.5 did not address the physician's failure to disclose his or her negligence. (See *Medical Malpractice, supra,* 2 Pacific L.J. at p. 669.) However, the Legislature apparently concluded that the statute, as proposed, did not provide sufficient incentive to disclose. "[I]nterested parties argued that it would be manifestly unfair to apply the four-year limitations period resulting in an absolute cutoff date in those cases in which plaintiff's failure to discover his cause of action within the statutory period stemmed from the failure of the health care provider to fulfill a fiduciary obligation to disclose errors and omissions. [Citation.] This argument was deemed persuasive and the proposed legislation was amended to provide for tolling . . . ." (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at p. 98.)

Since the one-year discovery limitations period does not encourage physicians to disclose their negligence, the propriety of tolling that period does not depend upon whether such tolling will encourage disclosure. Moreover, as this court noted in *Sanchez* v. *South Hoover Hospital,* "the treating physician is not always the only source from which knowledge comes, or from

---

[2]The original version of the statute, enacted in 1970, provided for a four-year absolute period of limitations. (Stats. 1970, ch. 360, § 1, p. 772.) As amended in 1975, the statute now provides a three-year limit on medical malpractice actions. (§ 340.5.)

which suspicion arises, that a claim exists.'' (18 Cal.3d at p. 100.) Similarly, the plaintiff's inability to immediately discover his or her injury and its negligent cause does not always result from a failure to disclose. Discovery can be hindered by the layperson's lack of expertise in medical matters and the nature of the injuries caused by medical malpractice. (See *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d at p. 188.)

In light of these considerations, section 340.5 balances the ''practical needs of prospective plaintiffs'' against the ''practical purpose that a statute of limitations serves in our legal system.'' (*Davies* v. *Krasna, supra,* 14 Cal.3d at p. 512; see majority opn., *ante,* at p. 899.) The statute delays the running of the limitations period until discovery, while at the same time imposing an absolute limitations period of three years. A rule that would toll the one-year discovery period upon an attorney's advice that plaintiff has no cause of action is perfectly consistent with that statutory scheme.

I would hold that plaintiff's medical malpractice cause of action was tolled by her first attorney's advice not to sue. It did not begin to run again until November of 1980 when plaintiff's second attorney informed her that she had a cause of action for medical malpractice.

Appellant's petition for a rehearing was denied November 14, 1985. Bird, C. J., was of the opinion that the petition should be granted.