Filed 3/4/20

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JUDITH BREWER et al., | F076467 |
| Plaintiffs and Respondents, | (Super. Ct. No. 2008813) |
| v. | |
| BENJAMIN J. REMINGTON, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. Roger M. Beauchesne, Judge.

Sheuerman, Martini, Tabari, Zenere & Garvin, Cyrus A. Tabari and Adam M. Stoddard for Defendant and Appellant.

Wilcoxen Callaham, William C. Callaham and Christopher G. Romero for Plaintiffs and Respondents.

-ooOoo-

**INTRODUCTION**

Defendant Benjamin J. Remington, M.D., appeals the trial court's grant of a motion for a new trial. On April 22, 2013, plaintiff Judith Brewer underwent carpal tunnel surgery and shoulder surgery performed by Drs. Pistel and Bedi. Early the next morning, she became paralyzed and sought emergency treatment. Remington performed a spinal decompression surgery on Judith on May 30, 2013, but Judith did not recover a substantial amount of function following the surgery.

Judith and Michael Brewer (collectively plaintiffs) filed a medical malpractice action on June 9, 2014, against Dr. Pistel, Dr. Bedi, Doctors Medical Center of Modesto, Inc. (Doctors Medical), Stanislaus Orthopedic & Sports Medicine Clinic (none of whom are parties to this appeal), and a number of Doe defendants. In July 2015, plaintiffs obtained through discovery medical charts and imaging from Doctors Medical, which they sent to a retained neurosurgical expert. Plaintiffs' expert opined Remington breached the standard of care by delaying Judith's surgery from April 23, 2013, when she was first examined by Remington, until May 30, 2013. On July 24, 2015, based on their expert's opinion, plaintiffs filed a doe amendment of their complaint, adding Remington as a defendant to the lawsuit.

At the end of 2016, Remington filed a motion for summary judgment on the ground plaintiffs' claims against him were barred by the applicable statute of limitations, and the trial court granted Remington's motion. Plaintiffs subsequently filed a motion for a new trial, asserting the grant of summary judgment was based on an error of law in the application of the delayed discovery rule. The trial court agreed with plaintiffs and granted the motion for a new trial, vacating and effectively reversing its previously issued summary judgment in favor of Remington.

Remington appealed. Remington contends the statute of limitations has expired as to plaintiffs' claims against him, the summary judgment order contained no error of law,

2.

and the trial court erred in granting plaintiffs' motion for a new trial. We conclude the trial court properly granted the motion for a new trial and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Judith's Surgery and Subsequent Care

On April 22, 2013, Judith underwent shoulder surgery and carpal tunnel surgery at Doctors Medical in Modesto. She awoke with paralysis and loss of sensation in her arms and legs in the early hours of the next day. She immediately went back to Doctors Medical, where she underwent examination and an MRI. Testing revealed she suffered central cord syndrome, cervical spinal stenosis, paraplegia, and incontinence requiring C4-5, C5-6, C6-7 anterior cervical discectomy with fusion and extensive rehabilitation. Remington made a chart note that Judith's lower extremities' function had reduced further by April 24, 2013. Remington elected not to perform a spinal decompression until May 30, 2013, after some of the swelling had reduced. Remington performed the surgery on May 30, 2013; afterward Judith regained some movement in her arms and legs.

### II.      Procedural Background

#### A.      Plaintiffs' Complaint and Doe Amendment

On June 9, 2014, plaintiffs Judith and Michael Brewer filed suit against Pistel, Bedi, Doctors Medical, and Stanislaus Orthopedic & Sports Medicine Clinic asserting claims of professional negligence as to the April 22, 2013, surgeries.[1] Plaintiffs jointly

---

[1]      As part of the Medical Injury Compensation Reform Act, attorneys are required to file a notice of intent to sue with health care providers before an action may be commenced against such providers for professional negligence. (Code Civ. Proc., § 364, subd. (a); *Woods v. Young* (1991) 53 Cal.3d 315, 320.) Subdivision (d) of section 364 provides that, "[i]f the notice is served within 90 days of the expiration of the applicable statute of limitations, the time for the commencement of the action shall be extended 90 days from the service of the notice." As such, the statute of limitations in professional medical malpractices cases is tolled 90 days when the section 364 notice to sue is provided in the last 90 days of the limitation period. (*Woods v. Young*, *supra*, at p. 328.) There is no dispute as to the timeliness of plaintiffs' original suit, as

stated a claim for medical professional negligence, and Michael stated a second claim for loss of consortium.

Discovery commenced and, in October 2014, plaintiffs propounded document requests on all defendants seeking, among other things, all medical records relating to Judith's surgeries and subsequent care. Complete production of all radiological images and charts were not produced by Doctors Medical until July 8, 2015.

Plaintiffs immediately sent the images and medical charts to Dr. Brian Andrews for his expert opinion regarding Judith's medical treatment. On July 20, 2015, after Andrews reviewed Judith's medical records, he opined Remington had breached the standard of care while providing neurosurgical consultation, evaluation, and treatment of Judith on April 23 and 24, 2013. According to Andrews, when Remington first evaluated Judith at 8:15 a.m. on April 23, 2014, he should have taken her to surgery immediately to decompress her spine. Andrews noted Judith first presented at Doctors Medical at 1:36 a.m. on April 23, 2013, with whole-body numbness and inability to move her extremities. An MRI performed at 6:11 a.m. of Judith's cervical spine showed severe congenital and degenerative spinal stenosis, severe spinal cord compression, and abnormal signal consistent with cord contusion, edema, or infarction. At 8:15 a.m., Remington evaluated Judith and noted in his chart that Judith still had neurological function—he noted she had strength of 2-3 as graded on a scale of 0 (absent) to 5 (within normal limits) in muscles of her upper and lower extremities. But, by the next morning on April 24, 2013, Remington's chart note indicated Judith's neurological function in her lower extremities had deteriorated to 0/5 (absent).

Andrews opined the evidence of deterioration in neurological function coupled with the MRI findings constituted a neurosurgical emergency, and Remington was

plaintiffs' counsel served the section 364 notices within the last 90 days of the statute, tolling the one-year limitation period 90 days.

4.

negligent for failing to immediately decompress her spine. By ignoring her deterioration and giving steroids while waiting for her swelling to subside before taking her to surgery, Remington breached the standard of care. Andrews further opined Remington's failure to immediately decompress Judith's spine was a significant factor in causing her neurological deficits.

Upon receiving Andrews's opinion, plaintiffs filed a Doe amendment to the complaint pursuant to Code of Civil Procedure section 474, substituting Remington in place of Doe 1 on July 24, 2015.[2] On September 8, 2015, Remington filed an answer.

### B.    Summary Judgment Granted in Favor of Remington

On December 8, 2016, Remington filed a motion for summary judgment on the ground that plaintiffs' claims against him were barred by the applicable statute of limitations and there were no triable issues of fact in this regard. Remington argued plaintiffs knew his identity and all of the facts giving rise to their claims against him by April 23, 2013, and certainly by May 30, 2013, when he performed the spinal decompression surgery. Relying on *Knowles v. Superior Court* (2004) 118 Cal.4th 1290, 1295 (*Knowles*) and *Gutierrez v. Mofid* (1985) 39 Cal.3d 892 (*Gutierrez*), among other cases, Remington argued plaintiffs knew of Judith's paralysis and its suspected cause or at the very least should have suspected wrongdoing by Remington as of April 23, 2013, when he first treated her, or by May 30, 2013, when he performed her spinal decompression surgery and her symptoms persisted, and absolutely no later than June 9, 2014, when plaintiffs filed their original complaint—an express indication of their suspicion of negligence regarding her medical care.

Plaintiffs filed an opposition asserting their claims against Remington had not accrued until July 2015, when they discovered the harm he caused. Specifically,

---

**2**    All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

plaintiffs argued they named Remington as a defendant as soon as they learned that his failure to immediately perform the spinal decompression surgery may have precluded Judith from recovering more of her abilities and caused her injury to become permanent. Further, the nature of Remington's negligence provided no basis for either plaintiffs or their counsel to suspect Remington had breached the standard of care and contributed to Judith's neurological injury.

In support of their positions, each party submitted portions of Judith's depositions taken on January 7, 2015, and November 19, 2015. Judith testified that immediately following her surgeries on April 22, 2013, she was able to walk with assistance, but when she awoke around midnight that night, she had lost sensation along with the ability to use her arms and legs. When she saw Remington, he said he wanted to wait until the swelling went down in her spine, and then he would perform surgery. She did not ask him whether the surgery could be performed sooner, she did not question his recommendation to wait for the swelling to go down, nor did she consult with any other physicians about whether it was appropriate to delay the surgery until the swelling had abated.

Remington performed the spinal surgery on May 30, 2013. None of the physicians Judith had seen between May 2013 and July 2015 suggested Remington should have performed the surgery sooner than he did; Remington had never talked to her about how much improvement she could expect from her condition, nor had anyone else. At the time of her depositions, Judith did not have full strength in her arms and she experienced tingling and numb spots. Judith explained none of the doctors had told her whether or in what time frame she might potentially regain her strength or the use of her arms and legs, but no one had told her she had reached her maximum potential recovery, either. After Remington performed the spinal surgery, she had a little more movement in her left leg and more movement in her arms.

After a hearing on the motion, the trial court granted summary judgment in favor of Remington.  The court stated that, "[i]n the case at bar, Mrs. Brewer knew of her paralysis the same day, if not the next, after surgery.  When Dr. Remington performed his surgery on Mrs. Brewer it was some thirty-nine (39) days later.  Therefore, Dr. Remington's alleged malpractice was independent of the paralysis injury incurred by Mrs. Brewer on April 23, 2013."  While finding the harm/injury caused by Remington was independent of Judith's paralysis injury, the court nonetheless granted the motion for summary judgment because the amendment adding Remington "was filed more than one-year after at least June 9, 2014, the latest date the one[-]year statute of limitations commenced."

### C.     Motion for a New Trial Granted

Plaintiffs then filed a motion for a new trial, asserting the court's summary judgment order was predicated on an error of law—i.e., the court had improperly applied the limitation period provided in section 340.5.  The one-year limitation period in section 340.5 commences when a plaintiff suspects or has reason to suspect that her injury was caused by wrongdoing.  Plaintiffs argued they did not know or have reason to suspect Judith was harmed in any way by Remington and, thus, had no suspicion he committed any wrongdoing until July 2015, when their expert explained Remington injured her through delaying her May 2013 surgery.  The harm Judith sustained from the initial surgeries was distinct from the harm she suffered from Remington's care.  According to plaintiffs, when they actually discovered, or reasonably should have discovered, Remington's harm to Judith was a disputed factual issue inappropriate for resolution on summary judgment.

The trial court agreed with plaintiffs and granted the motion for a new trial.  The trial court gave the following reasons, in relevant part:

> "The Court concludes its summary judgment ruling finding that the amendment to the Complaint adding Dr. Remington was filed 'more than

7.

one-year after at least June 9, 2014, the latest date the one-year statute of limitations commenced' was an error in law as Plaintiffs contend. [℗] … [¶] The gravamen of the issue beyond that of alleged legal error is a determination of 'when [Judith] actually suffered appreciable harm, if any, related to Dr. Remington's treatment and the date of discovery.' [Citations.] [¶] In conclusion, the Court agrees with Plaintiffs' Counsel it committed a legal error as to the applicable time frame of the statute of limitations and further concludes that the issue of whether or not, through the use of reasonable diligence, Plaintiff should have discovered any injury as a result of Dr. Remington's medical treatment and or medical determinations/opinions. Therefore, there is a triable issue of material fact as to the pertinent statute of limitations and its attendant timeframe."

Remington appealed the trial court's order granting a new trial.

## DISCUSSION

### I. Parties' Arguments

Remington argues the injury alleged to have been caused by the originally named defendants is the same injury upon which the claims against Remington are based—Judith's paralysis and loss of sensation. While plaintiffs may have been unaware of exactly how Remington contributed to Judith's ultimate injury, they were aware she had been injured, and her symptoms of paralysis and loss of sensation persisted both before and after Remington's treatment and the spinal decompression surgery. Remington argues it is the suspicion that *someone* was negligent that commences the statute of limitations and triggers the plaintiff's duty to investigate—not when plaintiffs discovered precisely *how* Remington was negligent. As the trial court observed in its summary judgment order, there was no factual dispute Judith first experienced her injuries on April 23, 2013, that she saw Remington immediately after perceiving her injuries, Remington performed surgery in May 2013, and Judith continued to experience loss of sensation and paralysis—all the facts about her injury and Remington's care were known to plaintiffs at that time—which triggered the statute of limitations.

Remington maintains plaintiffs' argument Judith suffered two separate injuries—one she was aware of and one she was not—triggering the statute of limitations at two

8.

different times, simply constitutes two different causative factors leading to her single injury. According to Remington, the fact plaintiffs did not know exactly who caused or contributed to Judith's injury is not relevant—it is when plaintiffs were aware of Judith's injury that is the controlling factor. Because the undisputed facts show Judith was aware of her injury, the statute of limitations commenced when she became (or should have become) suspicious of negligence. Plaintiffs were suspicious of negligence when they served their intent-to-sue notices on the original defendants. As such, Remington asserts, the trial court improperly granted plaintiffs' motion for a new trial.

Plaintiffs maintain the discovery rule delays accrual of an action until the plaintiff discovers, or has reason to discover, her injury and its negligent cause. Plaintiffs argue they had no reason to know Remington harmed Judith at all, separately injuring her. Plaintiffs maintain the second injury by Remington was not known to them until July 2015, when their expert told them Remington had breached the standard of care. Plaintiffs contend the trial court's order granting a new trial correctly pointed out there were factual issues whether Judith suffered injury by two separate incidents and when Judith knew or should have known of the injury caused by Remington. Given the factual dispute whether Judith suffered a second injury as a result of Remington's care and when plaintiffs reasonably should have discovered Judith's second injury, plaintiffs maintain the trial court correctly granted the motion for a new trial and its order should be affirmed. [3]

## II.    Standard of Review

An order granting summary judgment is properly challenged by a motion for a new trial. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 858 (*Aguilar*).) "This

---

[3]    Issues pertaining to the relation-back doctrine as applied to Doe amendments under section 474 were not addressed in the trial court's order granting a new trial, and they were not expressly briefed by the parties here. We express no opinion on the applicability of the relation-back doctrine.

9.

is so, even though, strictly speaking, 'summary judgment … is a determination that there shall be no trial at all.'" (*Ibid.*) A new trial may be granted under section 657, subdivision (7), if the original ruling was erroneous as a matter of law. (*Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 397.)

Typically, an order granting a new trial is reviewed for abuse of discretion as to whether the trial court gave an adequate statement of its reasons for ordering a new trial. (§ 657; *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159.) However, where the sole determination underlying the trial court's order granting a new trial is the asserted error of law in its order granting summary judgment, such an order is reviewed de novo. (*Aguilar, supra*, 25 Cal.4th at p. 860.) This is so because any determination underlying the order must be scrutinized according to the test applicable to that determination. (*Ibid.* ["[T]he superior court's order granting a new trial was predicated, specifically, on its determination that, in granting the petroleum companies summary judgment, it made an error in law .… [¶] … [and] such a determination is itself scrutinized de novo."].) Summary judgment should be granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c); *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003.)

## II. Legal Framework[4]

### A. Statute of Limitations Under Section 340.5

Statutes of limitations prescribe the length of time a plaintiff is given to bring suit or be barred. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) Generally, the limitation period "runs from the moment a claim accrues." (*Ibid.*; § 312

---

[4] Neither party disputes Michael Brewer's loss of consortium claim is subject to the discovery rule on the same basis as plaintiffs' negligence claim—but only to the extent the discovery rule applies to that claim. (See *Uram v. Abex Corp.* (1990) 217 Cal.App.3d 1425, 1438 [applying delayed discovery rule to wife's loss of consortium claim].)

[action must be "commenced within the periods prescribed in this title, after the cause of action shall have accrued"].)  California follows the "'last element'" accrual rule, which provides the statute of limitations runs from the occurrence of the last element essential to the cause of action.  (*Aryeh*, *supra*, at p. 1191.)  Our Supreme Court has described the essential elements for statute of limitations purposes as "'wrongdoing, harm, and causation.'"  (*Ibid*.)

Section 340.5 sets forth the statute of limitations for medical malpractice actions. In relevant part, that section provides as follows:

> "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of the action shall be three years after the date of the injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first .…"

"[T]he term 'injury,' as used in section 340.5, means both a 'person's physical condition *and* its "negligent cause."'"  (*Gutierrez*, *supra*, 39 Cal.3d at p. 896.)  The word "injury" for purposes of section 340.5 is a term of art that "refer[s] to the damaging effect of the alleged wrongful act and not to the act itself."  (*Larcher v. Wanless* (1976) 18 Cal.3d 646, 655–656, fn. 11.)  The injury is not necessarily the ultimate harm suffered, but instead occurs at "the point at which 'appreciable harm' [is] first manifested." (*Brown v. Bleiberg* (1982) 32 Cal.3d 426, 437, fn. 8; see *McNall v. Summers* (1994) 25 Cal.App.4th 1300, 1309 [§ 340.5 limitation periods commence when there is "appreciable harm or the point in time at which appreciable harm is first manifested"].)

Under the one-year limitation period of section 340.5, the plaintiff must bring suit within one year after he or she discovers, or should have discovered, his or her injury. However, a plaintiff need not be aware of either the specific facts or the actual negligent cause of the injury.  (*Knowles*, *supra*, 118 Cal.App.4th at p. 1295.)  If the plaintiff has notice or information of circumstances that would put a reasonable person on inquiry notice, the limitation period is activated.  (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d, 1103,

11.

1110–1111.)  When this occurs, the "patient is charged with 'presumptive' knowledge of his negligent injury .…"  (*Gutierrez, supra*, 39 Cal.3d at pp. 896–897.)  There is, however, no bright-line rule that when a plaintiff has cause to sue based on knowledge or suspicion of negligence, the limitation period begins to run as to *all* potential defendants, regardless of whether those defendants are alleged as wrongdoers in a separate but related cause of action.  (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 813 (*Fox*).)  If "a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim."  (*Ibid.*)

### B.  Legal Applications:  Discovering an Injury and a Negligent Cause

The limitation period of section 340.5 may commence, as a matter of law, once appreciable harm unambiguously manifests which causes *actual* suspicion of wrongdoing.  For example, in *Knowles*, the decedent (Anatalio) underwent two different surgeries on back-to-back days in November 2000; the first procedure was performed by Dr. Knowles, and the second procedure was performed by Drs. Dilley and Chock.  Three days after the second procedure, Anatalio died.  (*Knowles, supra*, 118 Cal.App.4th at p. 1293.)  Anatalio's wife immediately ordered an autopsy, obtained the medical records, and, along with her children, filed suit in November 2001 against Dilley, Chock, and the hospital.  (*Id.* at p. 1294.)  The plaintiffs' lawyer later consulted with an expert who, in October 2002, opined Knowles also may have been negligent, and Knowles was added to the suit in November 2002.  (*Ibid.*)  Knowles sought summary judgment based on expiration of the statute of limitations, which the court denied.  (*Ibid.*)

Upon review of Knowles' writ petition, the appellate court reversed the denial of summary judgment holding the statute of limitations for medical malpractice against Knowles had commenced as a matter of law shortly after Anatalio's death in November 2000, when the plaintiffs admitted they suspected medical negligence caused his death.

12.

(*Knowles*, *supra*, 118 Cal.App.4th at pp. 1294, 1298.)  While the plaintiffs argued they did not specifically suspect Knowles's negligence until October 2002, the court found the cause of action against Knowles was within the scope of their initial suspicion of medical negligence:  "They knew, or should have known, that Knowles had performed the initial surgery, and they suspected that some form of medical malpractice had caused Anatalio's death four days later." (*Id.* at p. 1300.)  The court explained it was not the expert's opinion but the plaintiffs' suspicion of negligence that triggered the limitation period. (*Ibid.*)  The facts supported only one conclusion—the statute commenced as to all the physicians' potential malpractice as soon as Anatalio suffered appreciable harm (death), which caused the plaintiffs to become suspicious of wrongdoing. (*Id*. at p. 1301.)

*Gutierrez*, *supra*, 39 Cal.3d at pages 896–903, provides another example of the general rule that suspicion of wrongdoing may activate the statute of limitations, even if one is unaware of the exact legal cause of action available.  In *Gutierrez*, the plaintiff went to the hospital complaining of pain in her right side in December 1978.  (*Gutierrez*, *supra*, 39 Cal.3d at p. 895.)  She consented to an exploratory operation to remove a tumor or her appendix.  (*Ibid*.)  When she awoke after surgery, she discovered the doctors had performed a complete hysterectomy.  (*Ibid*.)  At her deposition, the plaintiff testified she had communicated her distress to many of the hospital's staff, and she felt consistently the doctors had done something wrong by failing to warn her the operation might end her ability to conceive.  (*Ibid*.)  About four months after the surgery, she consulted with a malpractice attorney who told her she had no provable case.  (*Id.* at p. 896.)

In November 1980, the plaintiff consulted with a second attorney, and filed a suit on November 21, 1980, nearly two years after the procedure.  (*Gutierrez*, *supra*, 39 Cal.3d at p. 896.)  The trial court granted summary judgment in favor of the defendants on statute of limitations grounds, and the plaintiff appealed.  The appellate court affirmed the grant of summary judgment, noting the plaintiff "both knew of her injury and suspected malpractice almost immediately after the operation." (*Id*. at p. 897.)  Although

the plaintiff did not discover the precise legal cause of action until the second attorney consultation, the court held it was irrelevant for the statute of limitations that the plaintiff is ignorant of her legal remedy or the theories underlying her cause of action. (*Id.* at pp. 897–898.) "[I]f one has suffered appreciable harm and knows or suspects that professional blundering is its cause, the fact that an attorney has not yet advised him does not postpone commencement of the limitations period." (*Id.* at p. 898.)

Yet, unsatisfactory outcomes or naturally occurring side effects are not necessarily sufficient as a matter of law to place a person on inquiry notice of a defendant's *wrongdoing*. In other words, even when there is an appreciable manifestation of harm, that harm may not necessarily cause any suspicion of wrongdoing. In *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048 (*Clark v. Baxter*), the plaintiff sued a manufacturer of latex gloves (Baxter). The plaintiff, a nurse, began experiencing symptoms such as skin rashes and breathing problems in 1992, which she suspected were caused by an allergic reaction to latex gloves. (*Id.* at p. 1052.) By January 1994, she had consulted doctors and concluded her symptoms were attributable to her latex allergy. (*Id.* at pp. 1052–1053.) Then, in January 1996, the plaintiff filed a complaint against Baxter alleging extended exposure to toxic substances contained in the gloves caused severe illnesses and injuries, which included the symptoms she had already been suffering. (*Id.* at p. 1053.)

Baxter filed a motion for summary judgment arguing the plaintiff's claim was filed out of time—at least two years before the suit was filed, she was fully aware of her injuries, attributed those to latex gloves, and suspected or should have suspected there was something wrong with the gloves. (*Clark v. Baxter*, *supra*, 83 Cal.App.4th at p. 1053.) In response, the plaintiff submitted a declaration explaining she had filed her action after reading an article at the end of 1995 about defects in the manufacturing process for latex gloves. (*Id.* at pp. 1053–1054.) While she had known about the connection between the gloves and her allergies since 1994, she believed her problems

14.

were simply caused by her own naturally occurring allergic reaction, not from any wrongdoing on the part of Baxter.  (*Ibid*.)  The court held there were triable issues of fact regarding the plaintiff's knowledge or suspicion of Baxter's wrongdoing—it was not clear as a matter of law the plaintiff was on notice of Baxter's wrongdoing based on symptoms the plaintiff assumed were part of her latex allergy.  (*Id.* at pp. 1059–1060.)

Even a strongly developed suspicion of wrongdoing, standing alone, will not *necessarily* commence the statute of limitations when there is a factual dispute whether that suspicion was linked to any appreciable harm.  In *Drexler v. Petersen* (2016) 4 Cal.App.5th 1181 (*Drexler*), the court considered when the statute of limitations commenced on a plaintiff's failure-to-diagnose malpractice claim.  Between 2006 and 2011, Drexler sought treatment from his primary care physician (Petersen) and a neurologist (German) for headaches and neck pain.  (*Id.* at pp. 1184–1186.)  Petersen and German believed Drexler's symptoms were due to tension, stress or carpal tunnel issues.  (*Ibid.*)  In January 2013, an emergency room doctor diagnosed Drexler with a brain tumor, but by then the tumor was so large that when it was removed the surgeons had to sever Drexler's cranial nerves, which caused a host of severe injuries.  (*Id.* at pp. 1184, 1187.)  Drexler filed suit in July 2013 against Petersen, German, and the hospital for whom they worked.  (*Id.* at pp. 1184, 1188.)

Drexler gave deposition testimony he never believed his headaches were due to tension and stress or problems with the muscles in his neck.  (*Drexler*, *supra*, 4 Cal.App.5th at p. 1187.)  He testified that after just a few visits with Petersen, he did not think he had properly diagnosed his headaches; he also thought German's 2010 diagnosis of carpal tunnel was "'a joke.'"  (*Ibid*.)  Drexler testified he was never satisfied with Petersen's and German's care, and he obtained medical records and consulted with an attorney about whether to sue Petersen for malpractice.  The attorney thought Drexler did not have a case, and Drexler did not see another physician until October 2012.  (*Ibid.*)

The trial court granted summary judgment to Petersen and German based on the expiration of the statute of limitations. (*Drexler*, *supra*, 4 Cal.App.5th at p. 1188.) The court ruled Drexler had suspicions of wrongdoing by Petersen by January 2011, when he consulted with the attorney. (*Ibid*.) Drexler's claim against German was likewise barred because Drexler had a suspicion of wrongdoing as early as March 2010, when German diagnosed him with carpal tunnel, which Drexler considered preposterous at the time. (*Ibid*.)

The appellate court reversed, determining that while Drexler's consultation with an attorney in January 2011 was strong evidence Drexler suspected wrongdoing by that time, there was a factual dispute when Drexler became aware of appreciable harm caused by Petersen and German. (*Drexler*, *supra*, 4 Cal App.5th at p. 1198.) Petersen and German argued Drexler suffered an increase in symptomatology while they treated him, which was a manifestation of appreciable harm, but the court held that evidence did not show Drexler's headaches were getting worse, and his neck symptoms were not definitively related to his brain tumor. (*Id.* at pp. 1196–1197.) It was, therefore, a factual question when the appreciable harm (failure to diagnose a brain tumor) manifested to trigger the statute of limitations—it could not be determined as a matter of law. (*Id.* at p. 1197.)

From that basic framework, we consider whether there is a disputed issue of fact as to plaintiffs' discovery of Judith's injury allegedly caused by Remington.

## III.  Analysis

"Resolution of the statute of limitations issue is normally a question of fact." (*Fox*, *supra*, 35 Cal.4th at p. 810.)  As our high court has observed, "[t]here are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge.  [Citation.]  It is a question for the trier of fact." (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597.)  "However, whenever reasonable minds can draw only one conclusion from

16.

the evidence, the question becomes one of law." (*Snow v. A.H. Robins Co.* (1985) 165 Cal.App.3d 120, 128, 135 [reversing summary judgment].) In its summary judgment order, the court found the statute of limitations had been triggered at the time Judith received care from Remington, or shortly thereafter, as a matter of law. In its order granting a new trial, the court determined there were factual disputes about whether Judith sustained a second injury from Remington and when a reasonable person would have been suspicious Remington had been negligent.

As noted above, the term "injury" as used in section 340.5 is a term of art—it signifies both the negligent cause and the damaging effect (appreciable harm) of the wrongful act, and not necessarily the ultimate injury suffered. (*Larcher v. Wanless*, *supra*, 18 Cal.3d at pp. 655–656 & fn. 11; *Brown v. Bleiberg*, *supra*, 32 Cal.3d at p. 437, fn. 8.) Thus, the one-year limitation period under section 340.5 requires the plaintiff to file a claim within one year of discovering appreciable harm and is, or should be, suspicious of wrongdoing as to the cause of that harm. The parties dispute how to characterize the statute-triggering injury in this case. Remington argues Judith's statute-commencing injury was her paralysis and loss of sensation during and after his medical care, which was apparent and appreciable throughout his treatment of her as well as after the spinal decompression surgery. Plaintiffs argue Judith suffered a second injury by Remington's delay of the spinal surgery, and it is a factual issue whether there was any appreciable harm plaintiffs should have discovered prior to July 2015 from which they reasonably should have suspected Remington had done something wrong. We agree with plaintiffs.

The persistence of Judith's symptoms during Remington's care, without more, does not trigger the statute of limitations as a matter of law. "The mere fact that an operation [or treatment] does not produce hoped-for results does not signify negligence and will not cause commencement of the statutory period." (*Bristol-Myers Squibb Co. v. Superior Court* (1995) 32 Cal.App.4th 959, 964, disapproved on other grounds by

*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 410, fn. 8 & *Fox*, *supra*, 35 Cal.4th at p. 803; see *Gutierrez*, *supra*, 39 Cal.3d 892 at p. 899 ["The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects. Thus, even if a patient is unhappy with his condition, he may not suspect he has been wronged."].) Plaintiffs indicate they did not perceive any harm resulting from Remington's care until July 2015. Judith testified no one told her before July 2015 the spinal surgery should not have been delayed and Remington never told her to expect any particular kind of recovery upon surgery, which might suggest the general persistence of Judith's symptoms was appreciable harm linked to Remington. In fact, Judith testified her symptoms were somewhat better after the spinal surgery. On this record, whether the persistence of Judith's paralysis and loss of sensation constitute an appreciable manifestation of harm cannot be determined as a matter of law.

Relatedly, whether plaintiffs should have linked the persistence of Judith's symptoms to wrongdoing by Remington is a factual question—there is evidence from which it can be inferred plaintiffs reasonably did not link Judith's symptoms to any wrongdoing by Remington. Again, at the time Judith sought care with Remington she already suffered from paralysis and loss of sensation. Until July 2015, no one told plaintiffs that Judith's symptoms would be relieved with surgery, or that the surgery should have been performed more quickly for better results. Other than the April 24, 2013, chart note that Judith's lower extremities were losing function, which should have, according to Andrews, signified a surgical emergency, there is no evidence Judith's condition worsened while she waited for the spinal surgery.

Similar to *Clark*, where the plaintiff initially attributed her symptomatology to her latex allergy and had no suspicion of the manufacturer's wrongdoing until much later, plaintiffs here claim they had no reason until July 2015 to suspect Judith suffered any harm as a result of Remington's care, even though they were aware of the appreciable harm Judith sustained before she sought treatment from Remington. (*Clark v. Baxter*,

18.

*supra*, 83 Cal.App.4th at pp. 1059–1060.)  Moreover, Judith testified at her deposition Remington was added as a defendant based on information from her lawyer—she did not concede to any suspicions about Remington's care.  No one told her waiting for the swelling to go down was inappropriate or that the surgery should have been performed sooner, and plaintiffs maintain they had no way to know the delay of the spinal decompression surgery was problematic absent any *appreciable* harm.  This evidence supports a reasonable inference Judith's paralysis and loss of sensation did not, and reasonably would not, give rise to suspicion of wrongdoing on the part of Remington.

For these reasons, *Knowles*, *supra*, 118 Cal.App.4th at pages 1294–1301, is also distinguishable.  There, Anatalio underwent two surgeries on back-to-back days, and then died just days after the second surgery.  (*Id.* at p. 1293.)  The harm was immediate and appreciable, and it admittedly cast suspicion of wrongdoing as to the doctors involved in the two prior surgeries.  (*Id.* at p. 1298.)  Because the harm to Anatalio had unambiguously manifested and its negligent cause was admittedly suspected to be his medical care prior to his death, the evidence supported only one reasonable conclusion— the statute as to Knowles was activated just after Anatalio's death.  (*Id.* at pp. 1300– 1301.)  The same is not true here.  Despite Remington's urging at oral argument that *Knowles* is indistinguishable because it involved two surgeries just as Judith underwent here*,* Judith's paralysis and loss of sensation manifested *before* she was treated by Remington, not after.  It is axiomatic that harm cannot manifest *before* it is caused by negligent wrongdoing.  In *Knowles*, both surgeries occurred just prior to the manifestation of harm (death), and the plaintiffs were admittedly suspicious of all the care rendered prior to the harm.  Remington's treatment cannot be reasonably linked to harm suffered before he ever treated her.

Moreover, simply because Remington's treatment did not resolve or more fully mitigate Judith's injuries did not, in itself, place plaintiffs on inquiry notice that Remington provided negligent care.  Under such an interpretation of the limitation period

19.

and discovery rule, every time medical treatment did not yield positive results (even if such results were not expected, promised or even reasonable) patients would be immediately charged with discovering a negligent cause before there was any reason to suspect harm or injury. Such an interpretation would encourage filing professional negligence claims before there was any good faith basis to do so. It also has the potential to disrupt doctor-patient relationships by forcing patients to assume that, despite any counsel from their trusted physician and in the absence of any reasonable suspicion of wrongdoing, the lack of perfect or more desirable treatment results is rooted in negligence. The singular lack of perfect or better treatment results cannot be a matter-of-law trigger commencing the statute of limitations for medical malpractice.

Here, it is disputed when there was an appreciable manifestation of harm *after* Remington started providing medical care to Judith. The *persistence* of Judith's symptoms was not *necessarily* an appreciable manifestation of harm from Remington's treatment. There is no evidence Judith's symptoms worsened during the five weeks she waited for the spinal surgery, nor is there evidence a certain level of improvement was an expected or a promised result of the spinal decompression surgery. (See *Dolan v. Borelli* (1993) 13 Cal.App.4th 816, 819–824 [statute began to run when patient, who understood from her surgeon she would be pain free 60 days after surgery, experienced significantly worse symptoms after surgery].) In fact, Judith experienced some small improvements after Remington's spinal surgery.

The harm resulting from medical treatment may not always be objectively appreciable to the layperson, thus its discovery may be delayed until someone with expertise uncovers it. This type of situation is distinguishable from cases such as *Knowles*, *supra*, 118 Cal.App.4th at pages 1298–1301, and *Gutierrez*, *supra*, 39 Cal.3d at pages 896–903, where appreciable harm had manifested and had given rise to suspicions of professional negligence, but the plaintiffs did not learn until later from medical or legal experts the precise extent or nature of the harm or its precise cause, or the existence of a

20.

legal cause of action. Thus, in *Drexler,* while the plaintiff was highly suspicious of his doctors' diagnoses and treatment of his head and neck pain, there were factual disputes about when appreciable harm from Drexler's undiagnosed brain tumor manifested— Drexler could not have been aware of the failure to diagnose his growing tumor until there were appreciable manifestations of it. (*Drexler*, *supra*, 4 Cal.App.5th at pp. 1196– 1198.) Similar to *Drexler*, Judith's symptoms of paralysis and loss of sensation were the reason she sought medical care from Remington in the first place, just as Drexler sought care for his headaches and neck pain. (*Id.* at p. 1184.) Judith's paralysis and loss of sensation persisted, in large part, throughout her treatment by Remington, as did Drexler's symptoms, without evidence of appreciable worsening. (*Id.* at pp. 1184–1187, 1196–1197.) While Remington's purported failure to recognize that Judith's condition required immediate surgery is not identical to the failure-to-diagnose issue in *Drexler*, the same principle applies to both cases: the accrual period under section 340.5 commences when there has been, from an objective standard, a manifestation of appreciable harm that would put a reasonable person on inquiry notice of wrongdoing. Like *Drexler,* we conclude there is a factual dispute *when* Judith experienced appreciable harm that would have caused a reasonable person to be suspicious of Remington's wrongdoing.

In sum, we agree with the trial court that granting summary judgment in favor of Remington on statute of limitations grounds constituted an error of law. We affirm the trial court's order granting plaintiffs' motion for a new trial.

## DISPOSITION

The trial court's order granting a new trial is affirmed. Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278, subd. (a)(1).)

_____
MEEHAN, J.

WE CONCUR:


_____
FRANSON, Acting P.J.


_____
SNAUFFER, J.